**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANNE HUMPHREYS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 10-cv-1302** |
| | : | |
| **BUDGET RENT A CAR SYSTEM** | : | |
| **INC., et al.,** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M**

Stengel, J.                                                     April 22, 2014

This is a class action suit arising out of a dispute over alleged damage to a car the plaintiff rented from Budget. Defendant Viking Collection Services attempted to collect the alleged debt to Budget for car damages, after the plaintiff refused to pay it. After I granted the plaintiff's motion to amend her complaint, the defendants filed this motion to dismiss and to strike allegations in the amended complaint.  For the reasons stated below, I will grant the defendants' motion in part without prejudice and deny it in part.

I.      **Background[1]**

a.  **Plaintiff's Factual Allegations**

In July 2008, Plaintiff Anne Humphreys—a resident of Pennsylvania—rented a car from Budget in Florida. As part of this transaction, she signed the standard form rental agreement and declined loss damage waiver (LDW) coverage. The rental agreement provided that if the renter declined to purchase LDW and the car was lost or

---

[1] The factual allegations in this section are taken from the amended complaint, unless otherwise noted.  See Am. Compl., Doc. No. 34.

1

damaged, the renter is liable for either the estimated repair cost or, if Budget in its sole discretion determines to sell the car, "the difference between the car's fair market retail value before it was damaged and the sale proceeds."[2]  The rental document also provided that the renter is responsible to pay for the loss-of-use of the car, without regard to fleet utilization, plus an administrative fee, and towing and storage charges.[3] While in Florida, the plaintiff's rental car stalled in a rain storm and was towed back to Budget. Budget then provided the plaintiff with a replacement car.

On January 27, 2009, Budget sent the plaintiff a letter stating that she owed Budget $11,225.55 for damage to the first car she rented while in Florida. Because the plaintiff declined LDW coverage, Budget claimed she was responsible for any damage to the car while it was in her possession, regardless of fault.

Because Budget first notified the plaintiff of the alleged damage more than six months after the incident, the plaintiff's credit card and auto insurance companies declined to cover the claim because it was submitted untimely. On March 2, 2009, the plaintiff sent a letter to Budget stating that her insurer and credit card company were not willing to pay for the damages. She refused to pay the alleged debt "[s]ince the delay of notification by Budget is what precluded timely submission of the claim, it would seem that the fault lies with Budget."[4]

---

[2] See Am. Compl., Doc. No. 34, Ex. 1 at 2.

[3] See id.

[4] Id. at 10.

On April 10, 2009, Defendant Viking Collection Service sent the plaintiff a letter at her home in Philadelphia demanding full payment of the $11,255.55 allegedly owed to Budget.[5] In determining the amount of damage owed, Budget subtracted the actual disposal proceeds or salvage value of the plaintiff's rental car ($6,775.00) from what Budget had listed the fair market value of the car to be prior to the accident ($17,434.12).[6] The $6,775.00 salvage value of the car was the amount that Budget received from selling the damaged car at auction ($7,000.00) minus the auctioneer's towing and administrative fees ($225.00).[7]

Budget also charged the plaintiff $150.00 for "appraisal/evaluation/administrative fees" and $416.43 for loss of revenue/use.[8] The $416.43 loss of revenue/use fee was calculated by multiplying the daily rate for the rental vehicle ($19.83) by Budget's fleet

---

[5] The rental agreement provision related to collection of a debt reads:

> 20. Collections. All charges, fees and expenses, including payment for loss of or damage to the car, are due at our demand. If you do not pay all charges when due, you agree to pay a late charge of the lesser of either 1 ½% per month on the past due balance. If that rate is not permitted by law, then you will pay the highest rate permitted by law on the past due balance. You will pay any collection costs, including a service charge, for any check that is not honored by a financial institution and [sic] reasonable attorney's fees. If you don't pay any amount when due, if the law permits, you authorize us to contact you or your employer at your place of business about payment. **If you fail to pay any indebtedness to us in full, you understand that we may report such deficiency to an appropriate credit reporting agency.**

Id., Ex. 1 at 4 (emphasis in original).

[6] See id., Ex. 4.

[7] See id., Ex. 3.

[8] The rental agreement also permitted Budget to charge the plaintiff for towing or storage fees. However, none were listed in calculating her damages. See id., Ex. 4. It appears that these charges may have been included in the administrative and towing charges which the auctioneer deducted from the car sales proceeds. See id., Ex. 3 (specifically "Elapsed Days Analysis" and "IAA Charges" sections).

utilization estimate (70%) by the number of days Budget claimed had passed before the vehicle was sold (30).[9]

A statement outlining the sale of the damaged rental vehicle at auction indicates that the car had "engine damage."[10] The statement lists the date of loss as July 30, 2008. Id. The car was then sold on August 13, 2008.[11] The statement indicates that the "elapsed total days" related to the loss was fifteen.[12]

According to Budget's records, the car rented by the plaintiff was purchased by Budget in January 2008 at a cost of $18,314.00.[13] At the time of the accident, Budget listed its book value as $16,354.45, which was the $18,314.00 purchase price minus the accumulated depreciation of $1,959.55.[14] The accumulated depreciation estimates the decline in value of the car for the six months that the car had been used.

Subsequently, the plaintiff brought this suit against Budget and Viking seeking damages, restitution, declaratory relief, an injunction, expenses, and attorney's fees. The complaint alleges a violation of the Fair Debt Collection Practices Act (FDCPA) by Viking, a breach of contract/breach of the covenant of good faith and fair dealing by Budget, and a violation of the Pennsylvania Fair Credit Extension Uniformity Act by

---

[9] See id.

[10] See id., Ex. 3.

[11] Id. Budget's internal accounting statement also lists the sale date as being August 13, 2008 with a "process date" of September 5, 2008. It is unclear from the record what this "process date" is. See Doc. No. 34, Ex. 2.

[12] Id.

[13] This amount is the "Capital Cost" listed in Budget's records. This record does not offer a M.S.R.P. See id., Ex. 2.

[14] See id.

both Budget and Viking. The complaint also asserts a count of unconscionability against

Budget (Count IV) and a count for declaratory judgment and injunctive relief (Count V)

to prevent the defendants from collecting the charges which she asserts she should not

owe.

The plaintiff also seeks to serve as a class representative for others who similarly

have declined the LDW coverage but have been unfairly charged for damages related to a

rental from Budget. The complaint proposes four classes: 1) a Viking Class, 2)

Pennsylvania Class, 3) Budget Class, and 4) Budget Subclass.[15] The first two classes

---

[15] The proposed Viking Class includes:
  1) all consumers who rented vehicles from Budget and declined LDW coverage;
  2) who received collection letters from Viking;
  3) relating to damage to Budget rental vehicles;
  4) who were damaged thereby; and
  5) after March 26, 2009.

The proposed Pennsylvania Class includes:
  1) all consumers residing in Pennsylvania;
  2) who rented vehicles from Budget and declined LDW coverage;
  3) who received demand or collection letters from Budget or Viking;
  4) relating to damage to Budget rental vehicles;
  5) who were damaged thereby; and
  6) after March 26, 2008.

The proposed Budget Class consists of:
  1) all persons who rent or rented vehicles from Budget and decline or declined Loss Damage Waiver coverage;
  2) who are or were charged the difference between the retail value of the vehicle and the salvage value of the vehicle, and/or who are or were charged for "loss of use" based, in part, on a formula which includes the number of days it took or takes Budget to sell the damaged car;
  3) who were damaged thereby; and
  4) within the applicable statute of limitations period.

The proposed Budget Subclass includes:
  1) all persons who rent or rented vehicles from Budget and decline or declined LDW coverage;
  2) who are or were charged the difference between the retail value of the vehicle and the salvage value of the vehicle and/or who were charged for "loss of use" based, in part, on a formula which includes the number of days it took or takes Budget to sell the damaged vehicle;
  3) who were damaged thereby;
  4) who were informed of such claim forty five (45) or more days after they returned the vehicle; and
  5) within the applicable statute of limitations period.

The plaintiff reserves the right to modify the class definitions after discovery.

relate to Counts I and II. The last two relate to Counts III and IV. The common questions the class action seeks to address are: 1) whether Budget appropriately calculates its "loss of use" damages to accurately reflect Budget's actual loss; 2) whether this formula is an unenforceable penalty; 3) whether Budget's use of the retail market value in determining damages is unreasonable when cars are valued above book value and the class members were charged separate fees for administrative and incidental costs.

### b.  Common Factual Allegations for Class Action

Budget used standard form agreements when contracting with its rental car customers. When renting a car from Budget, customers may opt to purchase LDW coverage in the event the car is damaged. Often customers decline with coverage because—as the LDW provision of Budget's agreement recognizes—such coverage is already provided to customers through their automobile insurance policies or credit card companies.[16] In the event that a customer declined LDW coverage and the car is

---

[16] The sections of the rental agreement pertaining to damage of the car state:

7. <u>Loss Damage Waiver</u>. Loss Damage Waiver (LDW) is <u>not</u> insurance and <u>not</u> mandatory. If you accept LDW by your initials on the rental agreement at the daily rate, for each full or partial day that the car is rented to you, and the car is used and operated in accordance with this agreement, we assume responsibility for the loss of or damage to the car except for your amount of "responsibility", if any, specified on the rental document. You acknowledge that you have been advised that your insurance may cover loss or damage to the car. You also acknowledge reading the notice on loss damage shown on the rental document, or at the end of these terms, or in separate notice form.

8. <u>Damage/Loss to the Car</u>. If you do not accept LDW, or if the car is lost or damaged as a direct or indirect result of a violation of paragraph 14 ["Prohibited Use of the Car"], you are responsible; and you will pay us for all loss of or damage to the car regardless of cause, or who, or what caused it. If the car is damaged, you will pay our estimated repair cost, or if, in our sole discretion, we determine to sell the car in its damaged condition, you will pay the difference between the car's retail fair market value before it was damaged and the sale proceeds. If the car is stolen and not recovered you will pay us for the car's fair market value before it was stolen. As part of our loss, you'll also pay for loss of use of the car, without regard to fleet utilization, plus an administrative fee, plus towing and storage charges, if any ("Incidental Loss"). If your responsibility is covered by any insurance, you will provide us with the name of the insurer and policy number, or if the insurance is provided by your card issuer, its insurer. You authorize us to process any or

damaged, Budget's rental agreement provides that the customer will have to "pay the difference between the car's retail fair market value before it was damaged and the sales proceeds [of the car]."[17] The customer also is required to "pay for loss of use of the car without regard to fleet utilization."[18]

In valuing its cars for its corporate records, Budget records the original cost of the car minus depreciation to arrive at an amount known as "book value." If a car is damaged, Budget will calculate its anticipated "loss" by subtracting the anticipated salvage net proceeds from the sale of the damaged vehicle from the book value of the car prior to the accident.[19] Budget normally keeps cars in service for eleven or twelve months. If the vehicles are in good condition, Budget will normally sell them in the wholesale market or back to the manufacturer for the approximate book value.

In calculating the bills sent to customers, however, Budget does not use the book value or "loss" amount it has recorded in its corporate ledger. Instead, it uses a fair market retail value which it says more accurately reflects its losses because it includes both the value of the car before the accident and costs associated with selling the

---

all of our Incidental Loss to your card at or after the completion of your rental. You also authorize us to collect any or all loss from a third party after we have collected our loss from you, we will refund the difference, if any, between what you paid and what we collected from the third party. If the law of a jurisdiction covering this rental requires conditions on LDW that are different than the terms of this agreement, such as if your liability for ordinary negligence is limited by such law, that law prevails. You understand that you are not authorized to repair or have the car repaired without our express prior written consent. If you repair or have the car repaired without our consent, you will pay the estimated cost to restore the car to the condition it was in prior to your rental. If we authorize us to have the car repaired, we will reimburse you for those repairs only if you give us the repair receipt.

Doc. No. 34, Ex. 1 at 2.

[17] See Doc. No. 34, Ex. 1 at 2.

[18] See id.

[19] By way of example, see Doc. No. 34, Ex. 2.

damaged vehicle. Budget claims it is too difficult to calculate the actual costs it incurs when selling a damaged vehicle. However, Budget also charges customers with administrative fees associated with the sale of the damaged car. On behalf of the class, the plaintiff alleges that this use of retail market value—which is meant to account for incalculable costs related to the sale of the damaged vehicle—and charge of administrative fees serves as a double counting of loss which would be considered an unenforceable penalty.

Budget also charges customers a "loss of use" fee to account for losses related to its inability to use the damaged vehicle for rental. Though the contract indicates that this fee will be calculated "without regard to fleet utilization," Budget typically multiplies the daily rate for the car by the number of days the car is unavailable for use by 70%— Budget's overall estimated fleet utilization. Budget's rental agreement does not disclose how the number of days lost is calculated. Budget caps the number of days lost at thirty.[20] The plaintiff also alleges that the "loss of use" formula is an improper and unenforceable penalty.

## II.    PROCEDURAL HISTORY

The plaintiff filed an initial complaint on March 25, 2010. On May 10, 2010, the defendants filed a Motion for a More Definite Statement under Rule 12(e). Subsequently, discovery in this case was stayed and the defendant's motion was denied without prejudice pending the resolution of a summary judgment motion in Benson v.

---

[20] See Defendants' Brief in Support of Their Motion to Dismiss and To Strike, Doc. No. 40 at 18.

Budget Rent A Car System, Inc., No. 08-4512, which involved similar questions of law and fact. The Benson motion was decided on September 29, 2011.

On April 13, 2012, I issued an order directing the parties to discuss the application of the Benson decision to the Humphreys case as well as a choice of law issue.[21] The plaintiff filed a motion to amend the complaint along with the response to my April order on April 30, 2012.[22] On March 4, 2013, I granted the plaintiff's motion to amend the complaint. While I did find that both this case and Benson asked the identical question of whether Budget's damages clause was reasonable, I held that the Benson opinion would not preclude any arguments that the plaintiff may present.[23] Humphreys v. Budget Rent A Car System Inc., et al., No. 10-1302, 2013 WL 797439, at *5 (E.D.Pa. March 4, 2013)(Stengel, J.).

In response, the defendants filed this motion to dismiss and to strike allegations of the amended complaint, pursuant to Federal Rules of Civil procedure 12(b) and 12(f). The motion requests that the court dismiss the complaint in its entirety. The defendants also request that all allegations that Budget unreasonably uses the retail fair market value

---

[21] Benson was a Pennsylvania Fair Credit Uniformity Act case where the Plaintiff alleged that Budget Rent-A-Car overbilled customers in Pennsylvania for damage to rental cars. Plaintiff, Peter Benson, filed a complaint against Budget on September 16, 2008, which he subsequently amended on November 20, 2008. On October 15, 2010, Defendants Budget and JNR Adjustment Company, Inc. filed a motion for summary judgment prior to any class certification. I denied the summary judgment motion only with respect to the measure of liquidated damages using the loss of use formula. I granted summary judgment in favor of the defendants on the issues with respect to whether the rental jacket as an incorporated document to the entire rental agreement and whether using the retail value of the vehicle—as opposed to the wholesale value of the vehicle—was a reasonable measure of Budget's damages. See Benson v. Budget Rent A Car System Inc. and JNR Adjustment Company, Inc., No. 08-4512, 2011 WL 4528334 (E.D.Pa. Sept. 29, 2011)(Stengel, J.).

[22] See Doc. No. 24 and 25.

[23] This decision was made in order to afford the plaintiff her "day in court," given that there was no record evidence to show that the outcome of the Benson motion for summary judgment would control the outcome in this case. See Humphreys v. Budget Rent A Car System Inc., et al., No. 10-1302, 2013 WL 797439, at *5 (E.D.Pa. March 4, 2013)(Stengel, J.).

of a pre-damaged vehicle in its damage calculations be striken because the court previously found in <u>Benson</u> such calculations are reasonable. The defendants also move to strike allegations related to the purported classes because, from the face of the complaint, the case cannot proceed as a matter of law as a class action.[24]

## III.    STANDARD OF REVIEW

### a.  Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.[25]  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  <u>Id.</u>; <u>see also</u> <u>D.P. Enters. v. Bucks County Cmty. Coll.</u>, 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim.  <u>Conley</u>, 355 U.S. at 47.  Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  <u>Id.</u>  The "complaint must

---

[24] The defendants' motion requests all such relief be granted. Though it is unclear, I assume that the motion requests that the complaint be dismissed and, in the alternative, the specified allegations be striken. I will proceed to review the motion as such.

[25] In deciding a motion to dismiss, the court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record.  <u>See</u> <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564.  Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true.  See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).  The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements.  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

A court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Brown v. Card Service Center, 464 F.3d 450, 456 (3d Cir. 2006)(quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

### b.  Motion to Strike

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Generally, motions to strike are not favored and will be denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." River Road Devel. Corp. v. Carlson Corp., Civ. A. No. 89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1382, 809-10, 815 (1969)).

### IV.  DISCUSSION

### a.  Jurisdiction and Venue

The plaintiff is a resident of Pennsylvania and a "consumer" as defined by the FDCPA. 15 U.S.C. § 1692(a)(3). Budget is a wholly-owned subsidiary of Avis Budget Group, Inc., a Delaware corporation with its principal place of business in New Jersey. Budget does business nationwide and internationally. Viking is a Minnesota corporation that does business in Pennsylvania. Viking is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692(a)(6). This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), 15 U.S.C. § 1692(k)(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1337.

Venue is appropriate in this district, pursuant to 28 U.S.C. § 1391, because the plaintiff's claims arose in part here and the defendants do business in this district.

### b.  Legal Sufficiency of Plaintiff's Claims

The plaintiff's complaint addresses two main issues: 1) whether she in fact owes the debt which has been charged against her and other class members (Count III, IV, and V); and 2) whether the collection of the asserted debt against her was legal and appropriate (Counts I and II). I will address each in turn.

### i.  Declaratory Judgment and Injunctive Relief as to Damage Estimation (Count V)

At the heart of the class pleadings is whether Budget's calculation of its loss in the event that a rental car is returned damaged is reasonable. This was the same issue raised in <u>Benson</u>. The defendants argue that <u>Benson</u> should serve as persuasive authority on whether the damages clause in the Budget rental agreement is reasonable and enforceable. As I already indicated in my decision granting the plaintiff's motion to

amend, <u>Benson</u> will not preclude this plaintiff was raising the issue of whether the damages provision is a reasonable calculation and offer her own evidence to support her arguments.[26]

A liquidated damages clause should serve as "a reasonable forecast as to just compensation for an injury that was difficult to estimate at the time [the parties] entered into the contract." <u>Finkle v. Gulf & Western Mfg. Co.</u>, 744 F.2d 1015, 1021 (3d Cir. 1984)(discussing the enforceability of liquidated damages provisions under Pennsylvania law).[27] A provision that calls for payment of a sum in the event of breach which is "disproportionate to the value of the performance promised or the injury that has actually occurred will be deemed a penalty." <u>Id</u>. "No true liquidated damages provision can put the [party] in a position legally superior to the one that it would have occupied had the [contract] been fully performed." <u>In Re Montgomery Ward Holding Corp.</u>, 326 F.3d 383, 388 (3d Cir. 2003).

---

[26] In making my decision in <u>Benson</u>, I explained that Pennsylvania law requires that the party asserting that the liquidated damages provision is unreasonable bears the burden of proof. Mr. Benson, however, did not establish that the calculation was an unreasonable estimate as compared to using the wholesale value for the car.

<u>Humphreys</u> and <u>Benson</u> differ in two main respects: 1) Humphreys argues that book value and not fair market retail value would be a more accurate way to estimate Budget's losses, while Benson argued that wholesale value of the car would be a more accurate estimate of Budget's losses since Budget doesn't buy and sell on the larger retail market; and 2) Humphreys received a notice that her rental car was damaged six months after she had returned a non-working car she rented to Budget, while Benson received notice of Budget's charges for damages two months after his car collided with a deer. These differences offer some rationale for evaluating the sufficiency of Ms. Humphrey's claim in its own right.

The two cases also initially differed in terms of the state law to be applied with Florida potentially being the governing law in this case and Pennsylvania being the governing law in <u>Benson</u>. The plaintiff in this case no longer contends that Florida law may be applicable and, instead, concedes that Pennsylvania law applies. Pennsylvania law is applicable in both cases.

[27] Pennsylvania follows the Restatement of Contracts §339. <u>Id</u>.

At this stage, the plaintiff has provided enough facts to call into question whether Budget's damages provision fairly calculates its losses. The plaintiff argues that book value, as opposed to fair market value, would be a more appropriate calculation of Budget's loss. Book value is the amount Budget uses in its own accounting to determine the value of the damaged vehicle before the accident in then determining its own loss from the accident or sale of the damaged vehicle.[28] Budget, however, does not use book value in order to calculate the loss when a vehicle is damaged. It claims that it instead uses fair market retail value—in accord with the contract terms—because it claims this value more accurately accounts for the loss from the sale of the damaged car, since other administrative costs associated with the sale are difficult to estimate.

It is questionable whether Budget's estimation—which it admits may be inflated but in order to recoup administrative costs associated with damaged car sales—is reasonable in light of the fact that Budget charges an administrative fee to the customer in addition to the loss it has estimated.[29] The plaintiff also argues that Budget incurs no extra vehicle acquisition costs, such as license or registration fees or wages, when a car is

---

[28] See Doc. No. 34, Ex. 2 by way of example.

[29] A facial review of the pleadings provides enough evidence to show that the plaintiff's claim that Budget's estimation is unreasonable. The plaintiff in this case, unlike the plaintiff in Benson, provided with her pleading a statement outlining the sale of the damaged vehicle. This statement offers some evidence that the buyer had estimated what the "actual cash value" of the car had been, before discounting the price based on damage. This ACV was substantially lower than the amount that Budget indicated in its charges to Ms. Humphreys. The ACV noted on the sales statement is $14,600.00 while Budget estimates the ACV to be $17,434.12. See Doc. No. 34, Ex. 2 and 3. Even under Benson, this evidence would also call into question whether Budget's estimation of damages were reasonable since it offers some indication of how the market would value the vehicle pre-accident.

14

retired—whether for injury or old age—further calling into question whether Budget's calculations of losses is accurate.[30]

Given that the plaintiff has provided information which suggests Budget's estimation of losses is inaccurate and may overestimate its losses (making it an unenforceable penalty), the plaintiff has pled enough to overcome the motion to dismiss. Overall, the plaintiff's allegations afford her the right to obtain evidence from Budget concerning the reasonableness of Budget's use of retail fair market value as a liquidated damages provision.

In terms of the plaintiff's own dispute with Budget over the charges she owes, if any, the plaintiff has plausibly pled that the amount Budget charged her may not be accurate. The plaintiff alleges that the vehicle she rented stopped working when it was driven through a puddle, requiring it to be towed away.[31] She was then given a replacement car by Budget.[32] The plaintiff then did not receive notice of the damages charged to the car until six months after the damaged car was returned to Budget. As the plaintiff argues, the fact that the car stalled and was towed would not necessarily implicate that she was responsible for damage to the vehicle. It was not clear whether the car would have worked once it dried out, whether a *de minimis* repair was needed, or

---

[30] See Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 47 at 7. Though not specifically stated, I reasonably infer that this allegation builds on the fact that Budget admits to purchasing so many cars in bulk often.

[31] Am. Compl., Doc. No. 34 at ¶ 45. See also Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 47 at 18.

[32] Am. Compl., Doc. No. 34 at ¶ 45.

whether a more costly problem was present.[33] For these reasons, whether the plaintiff owes the alleged damages is questionable.[34]

Even if the plaintiff does owe Budget money for repairs to the vehicle she rented, a facial review of the pleadings and their attachments calls into question what amount she owes. The plaintiff in this case provided with her pleading a statement outlining the sale of the damaged vehicle.[35] This statement offers some evidence that the buyer had estimated what the "actual cash value" of the car had been, before discounting the price based on damage. This ACV was substantially lower than the amount that Budget indicated in its charges to Ms. Humphreys.[36] Even under the theory that fair market value is a fair estimation of Budget's losses, this exhibit calls into question whether Budget's calculation of fair market value is accurate. Budget also charged the plaintiff for thirty days of lost use when in fact the sale statement of her vehicle shows that that vehicle was

---

[33] See Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 47, at 18. Though the plaintiff does not argue this, it is also reasonable to infer from the facts pled that the car stopped worked because Budget may have rented the plaintiff a faulty vehicle and the plaintiff would not be responsible for the alleged damages.

[34] Budget claims that the plaintiff was responsible for any damage to the car while it was in her possession, regardless of fault, because the agreement provides such if the plaintiff has not purchased loss damage waiver coverage. See the "Damage/Loss to the Car" section of Doc. No. 34, Ex. 1 at 2 ("you will pay us for all loss of or damage to the car regardless of cause, or who, or what caused it."). While the actual language of the agreement does allow for recovery of damage to a vehicle regardless of fault, other provisions appear to not make recovery of repairs for a non-working vehicle automatic. See id. ("You also authorize us to collect any or all loss from a third party after we have collected our loss from you, we will refund the difference, if any, between what you paid and what we collected from the third party….You understand that you are not authorized to repair or have the car repaired without our express prior written consent….If we authorize to have the car repaired, we will reimburse you for those repairs only if you give us the repair receipt.").

[35] See Am. Compl., Doc. No. 34, Ex. 3.

[36] The ACV noted on the sales statement is $14,600.00 while Budget estimates the ACV to be $17,434.12. See Am. Compl., Doc. No. 34, Ex. 3 and 4.

sold thirteen days after it was damaged.[37] Overall, the pleadings offer evidence that the plaintiff's estimated damages are inaccurate.

Viewing the pleadings and attachments in the light most favorable to the plaintiff as the non-movant, the plaintiff has plausibly pled that she—and others—may not be responsible for the amount charged, may be entitled to declaratory judgment as to what she owes if anything, and be entitled to an injunction to prevent the defendants from collecting the alleged debt.

### ii.    Breach of Contract Claims (Counts III and IV)

The plaintiff brings two contract-based claims: 1) Count IV for unconscionability of the "loss of use" provision, calculation of damages generally, and lack of notice provided the plaintiff; and 2) Count III for breach of contract/breach of the covenant of good faith and fair dealing. These address whether specific provisions in Budget's agreement, as they have been interpreted by Budget in asserting a damage claim against a renter, are enforceable.

### iii.    Unconscionability (Count IV)

The defendants argue that Budget's Unconscionability claim (Count IV) is not viable as a matter of law. "Under Pennsylvania law, 'Unconscionability may only be asserted as a defense in an action on a contract for the sale of goods.'" Williams v. Enterprise Holdings, Inc., Civ. No. 12-05531, 2013 WL 1158508, at *4 (E.D.Pa. March 20, 2013)(quoting Witmer v. Exxon Corp., 394 A.2d 1276, 1286–86 (Pa.1981))(quotation marks omitted); Grimes v. Enterprise Leasing Co. of Philadelphia, LLC, 66 A.3d 330,

---

[37] See Doc. No. 34, Ex. 3 and 4.

340 (Pa. Super 2013). The plaintiff does not contest this argument, in light of Grimes, and does not oppose a dismissal of Count IV.[38] Therefore, I will dismiss plaintiff's Count IV, Unconscionability.

### iv.    Breach of the Covenant of Good Faith and Fair Dealing

The plaintiff's second contract claim—for breach of contract/breach of the covenant or good faith and fair dealing (Count III)—builds on the plaintiff's claim that she does not owe the amount alleged by Budget because Budget inaccurately calculated what loss it incurred as a result of the damage to the vehicle. The plaintiff points to two actions by Budget which she claims violate the covenant of good faith and fair dealing: 1) Budget's loss of use calculation, and 2) Budget's notice of her damages six months after she rented her car.

Under Pennsylvania law, every contract implies a duty of good faith and fair dealing in its performance and its enforcement. John B. Conomos, Inc. v. Sun Company, Inc., 831 A.2d 686, 706 (Pa. Super 2003). The purpose of these implied covenants "is to prohibit a party from 'taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous.' " Curley v. Allstate Ins. Co., 289 F.Supp.2d 614, 617 (E.D.Pa.2003) (quoting Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir.1992) (Posner, J.)). The covenants are not intended to override the express terms of the parties' bargain. Id. In the absence of an express provision, the

---

[38] The plaintiff, however, reserves the right to revive unconscionability as an affirmative defense to any counterclaim Budget may bring. Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 47 at 2 n. 1.

doctrine of necessary implication may act to imply a missing term or requirement
necessitated by reason and justice to effectuate the intent of the parties; thereby, implied
duties are solely gap fillers and may not be inserted to trump the express provision in the
contract. Id.

Courts use good faith requirements to aid in effectuating that to which the parties
have agreed, not to override those agreed-upon expectations and duties. See Duquesne
Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 617 (3d Cir.1995); LSI Title
Agency, Inc. v. Evaluation Services, Inc., 951 A.2d 384, 391–92 (Pa.Super.Ct.2008)
(finding that "the claim for breach of the implied covenant of good faith and fair dealing
is subsumed in a breach of contract claim"). Good faith generally entails "faithfulness to
an agreed common purpose and consistency with the justified expectations of the other
party." Restatement of Contracts § 205 cmt. a.[39]

Both how the loss of use is calculated and what time frame Budget has to give
notice of damage are not expressly stated in the contract. However, they both relate to
provisions in the contract to which the parties have agreed. Therefore, these areas would

---

[39] Restatement of Contracts § 205 discusses the duty of good faith and fair dealing stating:

> c. Good faith performance. Subterfuges and evasions violate the obligation of good faith in performance
> even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be
> overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of
> types of bad faith is impossible, but the following types are among those which have been recognized in
> judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering
> of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate
> in the other party's performance.

The Pennsylvania Supreme Court has not explicitly adopted § 205, but several diversity courts in Pennsylvania have
predicted that the Court would do so if presented with such a question. See Kamco Indus. Sales Inc., 779 F.Supp.2d
416, 425 (E.D.Pa. 2011); Zaloga v. Provident Life & Accident Ins. Co. of America, 671 F.Supp.2d 623, 629–30
(M.D.Pa.2009); Western Sur. Co. v. WGG, Inc., 2009 WL 222429, at *3 (M.D.Pa.2009); Fitzpatrick v. State Farm
Ins. Co., 2010 WL 2103954, at *3 (W.D.Pa.2010); but see Leder v. Shinfeld, 609 F.Supp.2d 386, 400
(E.D.Pa.2009).

be governed by the covenant of good faith and fair dealing as gap fillers and would not override the express provisions.

Regarding the first, the plaintiff argues that the loss of use calculation is unreasonable because it calculates loss based on the number of days between the date of damage to the date of sale, when in fact the defendants should calculate the loss based on the time frame between date of damage and replacement date—a more accurate calculation of Budget's actual damages.[40] Ultimately, the plaintiff contends that Budget's method of calculating loss of use overestimates its actual losses and imposes on the plaintiff and class members illegal penalties.

The defendants argue that the claim related to the loss of use provision cannot proceed because it does not tie the breach to a particular contract provision nor offers a pleading of damages. The defendants also contend her claim is deficient because it does not allege a replacement date. These arguments are unpersuasive. The defendants themselves admit that the plaintiff's claim points to the loss of use provisions of the contract, which the defendants agree do not expressly indicate how the loss of use is calculated. It is reasonable to infer that if the loss of use provision overcharges renters, those renters would suffer damages. In addition, the argument that the plaintiff has not pled the date of replacement has no merit; this would not be information the plaintiff would likely be privy to at this stage. Given that Budget replaces cars almost every day, it is plausible that Budget may have replaced the car sooner than the sale date, thereby

---

[40] As noted above, even if Budget did calculate the loss of use based on the date of sale, the attachments to plaintiff's complaint indicate that they may not be *actually* calculating the loss of use in this way. See Am. Compl., Doc. No. 34, Ex. 3 (noting that fifteen days elapsed between the date of loss and the date of sale) and Ex. 4 (indicating that thirty days elapsed between the date of loss and the date of sale).

mitigating its losses as required. This mitigation should be reflected in the loss of use calculation.

The plaintiff has sufficiently pled that the loss of use provision may violate the covenant of good faith and fair dealing.

With regards to the notice violation, the defendants argue that the plaintiff failed to identify the specific contractual duty or provision related to this breach. The plaintiff counters that this violation implicates the parties' understanding that loss damage waiver coverage may be covered by a renter's insurance, either through the renter's auto insurer or credit card.[41] The "Damage/Loss to the Car" section of the agreement itself indicates that, in the event of damage when a renter has declined LDW coverage, the plaintiff is expected to provide Budget will insurance information in order to cover the damage claim. As the plaintiff argues, reasonable notice of damages is a prerequisite of this understanding between the parties.

I agree with this rationale. It is plausible that Budget's failure to notify the plaintiff of damages until six months after the alleged damage is unreasonable and would frustrate the parties' intent to have the damage covered by the plaintiff's insurance. Since the contract offers no notice provision, this issue would be governed by the covenant of good

---

[41] See the "Damage/Loss to the Car" section of Doc. No. 34, Ex. 1 at 2 ("If your responsibility is covered by any insurance, you will provide us with the name of the insurer and policy number, or if the insurance is provided by your card insurer, its insurer.") and the "Loss Damage Waiver" section of Doc. No. 34, Ex. 1 at 2 ("You acknowledge that you have been advised that your insurance may cover loss or damage to the car.").

faith and fair dealing. The plaintiff has sufficiently pled a breach of contract claim under the theory of good faith and fair dealing related to notice.[42]

I will deny the defendants' motion to dismiss Count III.

### v. Violations Related to Debt Collection (Counts I and II)

The plaintiff alleges that Viking violated §§ 1692f and 1692e of the Federal Debt Collection Practices Act (FDCPA) and that both Viking and Budget violated state provisions Pennsylvania Fair Credit Extension Uniformity Act (FCEUA) 73 Pa.C.S. § 2270.4(a) and (b).[43] These claims are premised on the theory that the charges Viking and Budget were attempting to collect from the plaintiff were illegal as unenforceable penalties.

---

[42] The defendants also offer two other arguments that have little merit. First, the defendants argue that the plaintiff has failed to plead bad faith. The Restatement of Contracts § 205 says that bad faith can include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." It is reasonable to infer from the pleadings that Budget's failure to give reasonable notice could be considered any of those examples, especially interference with the plaintiff's ability to comply with the expectation that the damage be covered by her insurance. This is enough to establish bad faith at this stage.

The defendants also argue that the voluntary payment doctrine defeats Counts III and IV. Under Pennsylvania law, the voluntary payment doctrine provides that "[w]here, under a mistake of law, one voluntarily and without fraud or duress pays money to another with full knowledge of the facts, the money paid cannot be recovered." Acme Markets, Inc. v. Valley View Shopping Center, Inc., 493 A.2d 736, 737 (Pa. Super. 1985); see also Williams, 2013 WL 1158508 at *2; Abreyava v. VW Credit Leasing LTD., Civ. No. 09-521, 2009 WL 8466868, *2-*4 (E.D. Pa., July 22, 2009). "Thus, money paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered." Acme Markets, 493 A.2d at 737 (citation omitted). Since the plaintiff has not yet paid the contested charges—as the defendants recognize, this argument is moot.[42]

The defendants also argue, in the alternative, that the plaintiff's lack of damages also defeats Count III. They claim that since the plaintiff and other class members have not paid Budget's claim to date, they have suffered no damages. This argument would essentially bar any recovery by the plaintiff in the event that the plaintiff's claim had been properly pled. The fact that the plaintiff is being charged with a debt she would not have to pay but for Budget's lack of notice is enough to show damages. See Fresh Start Industries, Inc. v. ATX Telecommunications Services, 295 F. Supp. 2d 521, 525 (E.D. Pa. 2007)(explaining how an action for breach of contract accrues at the time the improper bill or overcharge becomes due).

[43] This claim also implicates the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1 et seq. Section 5(a) of the FCEUA provides that a finding of an unfair or deceptive debt collection act or practice under that act constitutes a violation of the UTPCPL. The UTPCPL provides remedies for violations of the FCEUA, which contains no remedies of its own.

The plaintiff's FDCPA claim is dependent on the notion that the disputed amounts she was asked to pay are "not expressly authorized by the Budget rental agreement or permitted by law" under FDCPA § 1692f(1). The defendants argue that a debt being collected, even if unreasonably calculated, would not violate the FDCPA unless the debt was falsely misrepresented or the means of collection were deceptive under FDCPA § 1692e or FCEUA § 4(b)(5).

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C.A. § 1692(e) (West 1982). The Third Circuit instructs that the language of the FDCPA should be construed broadly in order to effectuate the statute's intent. See Brown v. Card Serv. Ctr., 464 F.3d 450, 453 (3d Cir. 2006); Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 367 (3d Cir. 2011).

The FDCPA and FCEUA are analogous statutes which differ primarily in one respect: the FDCPA applies only to debt collectors, while the FCEUA applies to both debt collectors and creditors.[44] In enacting the FCEUA, the Pennsylvania General Assembly expressly incorporated that a violation of the FDCPA would be a violation of the FCEUA for debt collectors; it adopted virtually identical language for creditors. See 73 P.S. § 2270.4(a).

### 1.    FDCPA § 1692f(1)

---

[44] See 73 P.S. § 2270.4(a)-(b).

Section 1692f(1) of the FDCPA precludes the use of "unfair or unconscionable means to collect or attempt to collect any debt" and "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[45] Under § 1692f(1), the only inquiry is "whether the amount collected is expressly authorized by the agreement creating the debt or permitted by law." Allen ex rel. Martin, 629 F.3d at 368.[46] Viking argues that it has not violated this section because the debts collected were expressly authorized by the rental agreement. The plaintiff argues that Viking is in violation because the amount collected was not permitted by law as an unenforceable penalty.[47]

Viking attempted to collect from the plaintiff costs for damage to the car, costs for loss of use, and administrative fees. The rental agreement expressly authorizes that the

---

[45] The FCEUA provides that any violation of the FDCPA by a debt collector is a violation of the FCEUA.73 P.S. § 2270.4(a). The statute as offers identical language pertaining to creditors:

> (b)(6)A creditor may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this paragraph:
> (i) The collection of any amount, including any interest, fee, charge or expense incidental to the principal obligation, unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

73 P.S. § 2270.4(b)(6)(i).

[46] In Allen ex rel. Martin, the Third Circuit offered guidance on the appropriate inquiry under this section; however, the court did not further explain what this inquiry entailed or whether the plaintiff in that case had a viable claim under § 1692f(1). Instead, the court remanded the case to the district court to determine whether the debt was expressly authorized or permitted by law. Id. at 369.

[47] The plaintiff also offers Simon v. FIA Card Servs., N.A.,732 F.3d 259 (3d Cir. 2013), as supplemental authority to support this argument. While this case does reaffirm Allen ex rel. Martin's recitation of the inquiry required under § 1692f(1), the issue in this case was whether § 1692f(1) governed communications from a debt collector to a consumer's attorney. Id. at 368. The case did not offer further guidance on how district courts should carry out the § 1692f(1) inquiry as it would pertain the issues in this case.

renter may be charged these costs and fees in the event of damage or loss to the car.[48] The rental agreement also expressly authorizes collection of these charges and any fees associated with collections.[49] Viking was permitted to collect these charges. See Sponaugle v. First Union Mortg. Corp., 40 Fed.Appx. 715, 717 (3d Cir. 2002)("First Union was not obligated to first obtain court approval….the charge is authorized by the mortgage document itself.").

While the plaintiff's argument that the charges are not permitted by law may be true, this question as to whether the underlying charges are valid or reasonable is one for contract law, not the FDCPA.[50] Section 1692f of the FDCPA "addresses the conduct of the debt collector, not the validity of the underlying debt." Kennedy v. United Collection Bureau, Inc., No. 09–cv–05480 DRD–MAS, 2010 WL 445735, at *4 (D.N.J. Feb. 3, 2010)(quoting Transamerica Fin. Servs., Inc. v. Sykes, 171 F.3d 553, 556 (7th Cir.

---

[48] See Am. Compl., Doc. No. 34, Ex. 1 at 2 ("8. Damage/Loss to the Car.")("If you do not accept LDW… you are responsible; and you will pay us for all loss of or damage to the car regardless of cause, or who, or what caused it. If the car is damaged, you will pay our estimated repair cost, or if, in our sole discretion, we determine to sell the car in its damaged condition, you will pay the difference between the car's retail fair market value before it was damaged and the sale proceeds….As part of our loss, you'll also pay for loss of use of the car, without regard to fleet utilization, plus an administrative fee, plus towing and storage charges, if any ("Incidental Loss").")

[49] See Am. Compl., Doc. No. 34, Ex. 1 at 4 ("20. Collections.")("All charges, fees and expenses, including payment for loss of or damage to the car, are due at our demand. If you do not pay all charges when due, you agree to pay a late charge of the lesser of either 1 ½% per month on the past due balance. If that rate is not permitted by law, then you will pay the highest rate permitted by law on the past due balance. You will pay any collection costs, including a service charge, for any check that is not honored by a financial institution and [sic] reasonable attorney's fees.").

[50] See Dougherty v. Wells Fargo Home Loans, Inc., 425 F.Supp.2d 599, 607 (E.D.Pa. 2006)("[P]aragraph 7 expressly authorizes Defendant to pay costs to protect the value of the mortgaged property, including attorney's fees, and to charge Plaintiff for such fees. Plaintiff's contention that the attorney's fees were not reasonable is more properly addressed in her breach of contract claim."); Dawson v. Dovenmuehle Mortgage, Inc., No. 00–6171, 2002 WL 501499, at *5-6 (E.D.Pa. Apr. 3, 2002)(finding that collecting fees expressly authorized by the agreement is not a violation of the FDCPA but that the reasonableness of those fees can be considered under a breach of contract claim).

1999))(quotation mark omitted).[51] "While attempting to enforce a fraudulent agreement may violate other laws, [Section 1692f of the FDCPA] does not reach this action." Transamerica, 171 F.3d at 555 (citations omitted).

For these reasons, the plaintiff's claim that Viking violated § 1692f(1) of the FDCPA is legally deficient.[52]

## 2.    FDCPA § 1692e(2)(A)

The plaintiff also asserts that Viking violated the FDCPA under § 1692e(2)(A) by sending a collection letter that misrepresented the amount and legal status of the alleged debt. Section 1692e(2)(A) provides: Section 1692e(2)(A) of the FDCPA prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt" including "[t]he false representation of the character, amount or legal status of any debt."[53]15 U.S.C. § 1692e. The plaintiff, however, has not pled how this letter was misleading, beyond stating that the underlying debt itself was unenforceable. While the

---

[51] Section 1692g of the FDCPA provides that collection notices must include notice of how a debtor can dispute a debt; it requires the debt collector to then verify the debt if it is disputed in accord with this procedure. This section would be considered superfluous if a debt collector's attempt to collect an inaccurate debt, in itself, were a violation of the statute. See 15 U.S.C.A. § 1692g(a)(3),(4),(5), and (b).

[52] To support their arguments as to this point, both parties offer case law which primarily center on whether service charges or collection charges are permissible. Since service or collection fees are not at issue in this case, I do not find these cases to be helpful in establishing whether the plaintiff has pled an adequate FDCPA violation. The contention in this case concerns the reasonableness of the underlying debt, not the reasonableness of associated fees for collection services.

[53] Again, the FCEUA provides that any violation of the FDCPA by a debt collector is a violation of the FCEUA. 73 P.S. § 2270.4(a). The statute as offers identical language on this section as it pertains to creditors:

   (b)(5) A creditor may not use any false, deceptive or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this paragraph:
       (ii) The false representation of the character, amount or legal status of any debt.
73 P.S. § 2270.4(b)(5)(ii).

FDCPA should be read broadly, this argument stretches its bounds too far.[54] The

Congressional findings and declaration of purpose section 1692a of the FDCPA provides

that "[i]t is the purpose of [the FDCPA] to eliminate *abusive debt collection practices* by

debt collectors." 15 U.S.C. § 1692(e)(emphasis added). The plaintiff fails to offer the

requisite factual allegations necessary to show that the defendants' *practices* in collecting

the alleged debt were misleading or abusive, as prohibited by the FDCPA.[55]

      Because the language in the FCEUA is identical to the language in the cited

FDCPA claims, my analysis as to the validity of the plaintiff's FDCPA claims would also

applies to the validity of her claims under the FCEUA. Therefore, the plaintiff also fails

to state a claim under the FCEUA for the reasons explained above. [56]

---

[54] Section 1692k(c) of the FDCPA also provides a debt collector with a "bona fide error defense" stating:
> (c) Intent
> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

This section also gives some credit to the fact that a debt collector would not be per se liable for attempting to collect a debt that may have been miscalculated by the creditor without express knowledge that such a miscalculation was illegal. See also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 590-94 (2010)(explaining how the bona fide error defense applies in calculation errors to the underlying debt); Beck v. Maximus, Inc., 457 F.3d 291, 297-98 (3d Cir. 2006)(explaining the inquiry for the bona fide error defense with a focus on the *procedures* used by the debt collector in ensuring a debtor is not falsely charged).

[55] The plaintiff cites several cases to support her §1692e claims: Randolph v. IMBS, Inc., 368 F.3d 726 (7th Cir. 2004); Dutton v. Wolpoff & Abramson, 5 F.3d 649 (3d Cir. 1993); Crossley v. Lieberman, 868 F.2d 566 (3d Cir. 1989); and Dutton v. Wolhar, 809 F.Supp. 1130 (D.Del. 1992). Crossley is unpersuasive because the violation at issue pertained to flaws in the debt collection communication which included legal threats in violation of the statute. Randolph concerned the impact of bankruptcy proceedings on the defendants' right to collect the debt and a misrepresentation in the collection communication of what was legally required. Wolpoff & Abramson Dutton involved a letter sent by a law firm that falsely represented that a debtor was already subject to liens on her property. Wolhar involved a false representation that the debtor was legally obligated to pay the debt of a parent, thereby misrepresenting the legal status of the claim. These cases point back to misrepresentations in the debt collector's communications, not in the underlying debt itself.

[56] Because a violation of the FCEUA is the plaintiff's only basis for plaintiff's claim under the UTPCPL, the plaintiff's claim under the UTPCPL is also insufficient.

For these reasons, I will grant the defendants' motion to dismiss Counts I and II without prejudice. [57]

### c. Motion to Strike

#### i. Damage Calculation Allegations Regarding Retail Fair Market Value

The defendants also request that all allegations of Budget's use of the retail fair market value as being unreasonable be striken. The defendants base this request on my ruling in <u>Benson</u>, which indicated that Budget's use of retail fair market value in its calculations was reasonable. As I discussed above, I will not prevent this plaintiff from putting forward her own arguments related to the damage calculation based on what was held in <u>Benson</u>. Furthermore, a court may strike allegations if they are "redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The plaintiff's allegations appear to be none of these. I will deny the defendants' request to strike allegations that the use of retail fair market value in damage calculations is unreasonable.

#### ii. Class Action Allegations

---

[57] I am dismissing this claim without prejudice. A facial review of the pleadings offers some evidence that a consumer could have been misled about the character, amount, and legal status of the debt. The statement outlining the sale of the plaintiff's damaged car, attached to the plaintiff's complaint, offers one estimate for the ACV of the vehicle. <u>See</u> Am. Compl., Doc. No. 34, Ex. 3. The Vehicle Loss Disclosure, also attached, offers a very different value for ACV—one which is substantially higher. <u>See</u> Am. Compl., Doc. No. 34, Ex. 4. If a demand letter with these attachments did not explain why the two amounts differ, an unsophisticated consumer could be confused and potentially misled by the amounts offered in the debt statements, *if* they were sent to him/her by Budget and Viking. <u>See</u> <u>Dougherty v. Wells Fargo Home Loans, Inc.</u>, 425 F.Supp. 2d 599, 607-08 (E.D.Pa. 2006)(explaining how a debt collector's failure to explain the charges being collected could be a violation of FDCPA § 1692e); <u>Wilson v. Quadramed Corp.</u>, 225 F.3d 350, 354 (3d Cir. 2000)(explaining how a collection letter which "can be reasonably read to have two or more different meanings, one of which is inaccurate" could violate the least sophisticated debtor standard) (citations omitted).

However, the amended complaint fails to explain whether these exhibits were a part of the debt collection letters or even how these exhibits were procured. Given that these exhibits offer some hint of a FDCPA § 1692e(2)(A) claim—and, in turn, a FCEUA and UTPCPL claim—I will allow the plaintiff to cure this deficiency in a second amended complaint, assuming that the facts permit such a claim.

The defendants also request that I strike the class action allegations from the pleadings because they claim they are insufficient from the face of the complaint. While a defendant may move to strike class allegations prior to discovery, determination of class certification on a motion to dismiss is premature and rare.[58] Federal Rule of Civil procedure 23, which governs class certification, requires a district court to conduct a "rigorous analysis;" discovery is often necessary in order to ensure that this analysis is properly undertaken.[59] See Landsman & Funk PC v. Skinder-Strauss Associates, 640 F.3d 72, 93 (3d Cir. 2011).

I am disinclined to strike the class allegations before discovery can offer the information necessary to perform this "rigorous analysis." However, I will briefly explain why a facial review of the class allegations does not warrant their dismissal at this point. The four main requirements that a plaintiff must plead in order to establish class certification are: numerosity, commonality, typicality, and adequacy of the representatives. FED. R. CIV. P. 23(a). A plaintiff must also meet the mandatory requirements in Rule 23(b) related to superiority and predominance.

---

[58] See, e.g., Vlachos v. Choice One Cmty. Fed. Credit Union, No. 3:11-CV-57, 2011 U.S. Dist. LEXIS 84403, at *8-9 (M.D.Pa. May 16, 2011)(citing Landsman & Funk PC v. Skinder-Strauss Associates, 640 F.3d 72, 93 n.30 (3d Cir. 2011)); Mills v. Serv. First Credit Union, Civil Action No. 4:11–CV–686, 2011 WL 3236313, at *1 (M.D.Pa. July 28, 2011); Vlachos v. Tobyhanna Army Depot Fed. Credit Union, Civil Action No. 3:11–CV–0060, 2011 WL 2580657, at *2 (M.D.Pa. June 29, 2011); Martin v. Ford Motor Co., 765 F.Supp.2d 673, 680–81 (E.D.Pa.2011); P.V. ex rel. Valentin v. School Dist. of Philadelphia, No. 2:11–cv–04027, 2011 WL 5127850, at *3-6 (E.D.Pa. Oct. 31, 2011).

[59] Defendants cite to Rule 23(d)(1)(D) to support their motion to strike. Courts are hesitant to strike class allegations before a motion for class certification has been filed. See, e.g., Landsman & Funk PC,  640 F.3d at 93. Rule 23(c) has been amended to allow class certification "at an early practicable time" (not "as soon as practicable after the commencement of an action" as it read pre-amendment); this change was made to ensure that the parties have sufficient information to litigate the issue. See FED. R. CIV. P. 23, Advisory Committee Note (2003).

Regarding numerosity, the plaintiff has alleged that Budget has over 2,500 car rental locations, that Budget's use of the "retail fair market value" and "loss of use" provisions were standardized, and that many Budget customers declined Loss Damage Waiver.[60]

"Commonality" requires the class of plaintiffs to share at least one question of law with the class representative. See Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir.1994). The plaintiff's claims relate to Budget's standard form agreement and Budget's uniform debt calculation practices, which would apply to anyone renting from Budget. In addition, the fact that the contractual provisions plaintiff cites in these agreements would be at the heart of any contract dispute a renter would have over damage calculations, it would appear that the issues raised by the plaintiff would apply to both her and the other class members.[61]

In the same respect, "typicality" requires that the plaintiff's claims to be typical of those of the rest of the class. Fed. R. Civ. P. 23(a)(3); see also Wisneski v. Nationwide Collections, Inc., 227 F.R.D. 259, 260-61 (E.D.Pa.2004). Given that Budget's damage formula and contract are uniform, the issues that the plaintiff raises would likely be

---

[60] The defendants do not even attempt to argue that the purported class members are fewer than forty, the number typically required under numerosity. See Sherman v. Am. Eagle Express, Inc., 2012 U.S. Dist. LEXIS 30728 (E.D. Pa. Mar. 8, 2012) ("[A] class of more than 40 people generally satisfies the numerosity requirement.").

In addition, Panetta v. SAP America, Inc., No. 05-4511, 2006 WL 924996 , at  *2 (E.D. Pa. April 6, 2006)(Stengel, J.), a case relied upon by the defendants, differs in this respect because this court rejected class certification in that case after the plaintiffs failed to respond properly to defendant's argument that only six people existed in the purported class.

[61] I am unpersuaded by the defendants' argument that the plaintiff's claims are defeated because they involve factual inquiries as to whether retail fair market value was higher than book value or sale date was later than replacement date. This argument actually supports the plaintiff's contention that the sufficiency of the class pleadings should be decided after discovery and not at this point.

typical (enough to facially pled typicality).[62] Lastly, there is enough pled at this point to indicate the plaintiff may be an adequate representative of the class since the issues she raises are ones raised by her own dispute with the defendants.[63]

Regarding the issues of superiority and predominance, the plaintiff's factual allegations would indicate that a class action suit would be a superior way to litigate these issues and that the issues she raises would predominate.[64] At the point, I cannot determine one way or another whether the defendants' arguments in this regard are valid. Only after discovery will I be able to assess these areas thoroughly, as required by Rule 23.

At this juncture, this is nothing from the face of the pleadings to indicate that this case is one of those rare instances when class allegations should be striken prior to discovery and a motion for class certification.[65] I will deny the defendants' motion to strike the specific allegations.

---

[62] The defendants' argument that this requirement is not met because the plaintiff has not alleged that the replacement date is before the sale date is unavailing as I explained above. As to the defendants' arguments that there is no indication all class members sustained damages or would not be precluded by the voluntary payment doctrine, the proposed class definitions offer sufficient limitations at this point to establish a legal claim, addressing these possible class deficiencies.

[63] I do not have information to find that the plaintiff is an inadequate representative of the class due to a conflict of interest, as the defendants argue. This is information that would be available after discovery, in determining a motion for class certification. See In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 137 (E.D. Pa. 2011); In re K-Dur Antitrust Litig., No. 01–1652 (JAG), 2008 WL 2699390 , at *7 n.9 (D.N.J. Apr. 14, 2008) ("[S]peculative and hypothetical conflicts are insufficient to defeat adequacy").

[64] As the plaintiff argues, neither the parties nor the court have had a sufficient opportunity to consider important issues that would affect class certifications: the number and geographical dispersion of class members (implicating variations in state law); and 2) whether there are any material variations in the insurance police and credit card agreements of the purported class members (to address the notice issue). This basic information would be necessary for a proper ruling regarding whether superiority and predominance are met.

[65] I will note that, in saying this, I recognize that my decision to dismiss Counts I and II would affect the plaintiff's proposed Viking and Pennsylvania classes, since these classifications involve debt collection violations. However, the plaintiff has only proposed these classes with the right to amend them later. Given that, I would expect that the plaintiff would make the appropriate changes to the class definitions at class certification in order to reflect my rulings up until that time. At this time, I also will not strike them because I have granted the plaintiff leave to amend his complaint to properly pled those counts, if the facts permit.

## V.     CONCLUSION

For the reasons discussed above, I will deny the defendants' motion to dismiss as to Counts III and V and will grant defendants' motion to dismiss Counts I, II, and IV.[66] I will also deny the defendants' motion to strike the specified allegations.

An appropriate Order follows.

---

[66] The plaintiff may file an amended complaint curing the deficiencies in Counts I and II, if the facts permit, within fourteen (14) days of the date of this memorandum.