THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNE HUMPHREYS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 10-cv-1302 |
| | : | |
| BUDGET RENT A CAR SYSTEM | : | |
| INC., et al., | : | |
| Defendants. | : | |

# M E M O R A N D U M

**Stengel, J.**                                          **July 21, 2016**

Anne Humphreys initiated this suit after a dispute arose over damage to a car that she rented from defendant Budget Rent A Car System, Inc. ("Budget").  After the plaintiff refused to pay the alleged debt, defendant Viking Collection Service, Inc. ("Viking") attempted to collect the debt.  The plaintiff has filed this action against both Budget and Viking and challenges the way in which Budget charges its customers for damage to its rental vehicles.  Specifically, the plaintiff contends that two formulas Budget uses to calculate the damages owed are impermissible liquidated damages clauses.  She also challenges Budget and Viking's collection practices with regards to these debts, arguing that these practices violate both the Fair Debt Collection Practices Act ("FDCPA") and Pennsylvania's Fair Credit Extension Uniformity Act ("PFCEUA").

The plaintiff now moves to certify four classes and six subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Because I find that the plaintiff has not met her burden of demonstrating that the commonality requirement of Rule 23 is satisfied and

because I am concerned that the plaintiff's proposed nationwide classes would not be manageable, I will deny the plaintiff's motion.

## I.     BACKGROUND

### a.  Budget's Rental Fleet

Budget purchases two types of vehicles—risk vehicles and program vehicles. Hr'g Tr., 119:24-25, Mar. 30, 2016.  A risk vehicle is one that is purchased directly from the manufacturer and that Budget later sells into the open market.  Id. at 120:1-4. Program vehicles also are purchased from the manufacturer but pursuant to a program that has a "guaranteed value or a guaranteed depreciation that [Budget] turn[s] back to the manufacturers."  Id. at 120:14-17.

Because of Budget's size, on any given day, it is "most likely taking a delivery of a car" at one of its locations within the United States.  Id. at 134:3-7.  An individual location, however, may go 30 to 60 days without taking delivery of a new car.  Id. at 134:5-7.  Further, Budget does not purchase replacement vehicles for specific damaged cars. Id. at 134:15-16.  Rather, the company buys in bulk based upon its rental demand. Id. at 134:15-18. Because Budget buys its vehicles in bulk, it normally pays less than retail customers pay per car.[1]  Id. at 136:4-6.

---

[1] Robert Adams, Vice President of Fleet Planning and Analysis for Avis Budget Group, later clarified that while Budget would normally acquire its risk vehicles at a lower price than that typically paid by retail customers, the price paid for program vehicles "would depend on what retail incentives the manufacturers have out in the marketplace."  Hr'g Tr. 136:9-11, Mar. 30, 2016.  Therefore, it is not clear that Budget always purchases its program vehicles at a lower cost than retail customers.

### b.  Budget's Formulas for Calculating Damages

Budget uses standardized rental agreements.  These agreements contain certain clauses which govern damages incurred to a rental car.  The sections of the rental agreement pertinent to the plaintiff's claims state:

> **7. <u>Loss Damage Waiver.</u>** Loss Damage Waiver (LDW) is not insurance and not mandatory. If you accept LDW by your initials on the rental agreement at the daily rate, for each full or partial day that the car is rented to you, and the car is used and operated in accordance with this agreement, we assume responsibility for the loss of or damage to the car except for your amount of "responsibility", if any, specified on the rental document. You acknowledge that you have been advised that your insurance may cover loss or damage to the car. You also acknowledge reading the notice on loss damage shown on the rental document, or at the end of these terms, or in separate notice form.

> **8. <u>Damage/Loss to the Car.</u>** If you do not accept LDW, or if the car is lost or damaged as a direct or indirect result of a violation of paragraph 14 ["Prohibited Use of the Car"], you are responsible; and you will pay us for all loss of or damage to the car regardless of cause, or who, or what caused it. If the car is damaged, you will pay our estimated repair cost, or if, in our sole discretion, we determine to sell the car in its damaged condition, you will pay the difference between the car's retail fair market value before it was damaged and the sale proceeds. If the car is stolen and not recovered you will pay us for the car's fair market value before it was stolen. As part of our loss, you'll also pay for loss of use of the car, without regard to fleet utilization, plus an administrative fee, plus towing and storage charges, if any ("Incidental Loss"). If your responsibility is covered by any insurance, you will provide us with the name of the insurer and policy number, or if the insurance is provided by your card insurer, its insurer. You authorize us to process any or all of our Incidental Loss to your card at or after the completion of your rental. You also authorize us to collect any or all loss from a third party after we have collected our loss from you, we will refund the difference, if any, between what you paid and what we

3

> collected from the third party. If the law of a jurisdiction covering this rental requires conditions on LDW that are different than the terms of this agreement, such as if your liability for ordinary negligence is limited by such law, that law prevails. You understand that you are not authorized to repair or have the car repaired without our express prior written consent. If you repair or have the car repaired without our consent, you will pay the estimated cost to restore the car to the condition it was in prior to your rental. If we authorize to have the car repaired, we will reimburse you for those repairs only if you give us the repair receipt.

Second Am. Compl., Ex. 1 at 2.  These provisions contain two types of damages – salvage damages and loss of use damages – both of which are assessed using standard formulas. Hr'g Tr. 69:4-7, Mar. 30, 2016.

The salvage formula is disclosed in the rental agreement, which states that the customer "will pay the difference between the car's retail fair market value before it was damaged and the [salvage] sale proceeds."  Second Am. Compl., Ex. 1 at 2.  Pursuant to Budget's loss of use formula, customers are charged the rental rate for the number of days before the damaged car is sold (not to exceed thirty days)[2] multiplied by 70%.[3] Hr'g Tr. 69: 17-20, Mar. 30, 2016.  This formula, however, is not enumerated in the rental agreement.  Id. at 70:8-15.

---

[2] The time it takes to sell a car for salvage can vary greatly.  For example, a car that was damaged in an accident in which serious injuries occurred may not be sold right away, as Budget may have a legal obligation not to do so.  Hr'g Tr. 153:9-13, Mar. 30, 2016.  Location and seasonality also play a role in how quickly cars are able to be sold for salvage.  Id. at 153:21-154:2.  On a fleet-wide basis, however, it takes on an average of 30.7 days to sell a car for salvage.  Id. at 154:6-11.  Regardless of how long it takes, a customer is not charged loss of use damages for a period greater than thirty days.

[3] Budget does not utilize this formula in states where state law prohibits or limits damages that may be charged for the loss of use.  States that prohibit the use of such a formula are California, Illinois, New York, and Wisconsin.  Id. at 69:25-70:4.  The number of days for which an individual can be charged is limited by law in Texas and Minnesota.  Id.

### c.  Budget's Collection Practices

When a renter who declined LDW coverage returns a damaged vehicle, Budget's standard practice is to send out a demand package that includes "a repair estimate, the fair market value photos, accident report and rental agreement."  Hr'g Tr. 72:12-19, Mar. 30, 2016.  Budget also includes a written estimate of the damages and the vehicle loss disclosure form in the packet.  Id. at 73:1-9.  This vehicle loss disclosure form lists the "actual cash value" of the car.  Id at 74:2-5.  Although not disclosed on the form, this is the car's retail fair market value.  Id. at 74:2-5. Also not disclosed is the fact that the actual cash value may be higher than the net book value of the car,[4] as recorded on Budget's financial books.[5]  Id. at 74:9-12.

### d.  The Plaintiff's Claim

In July 2008, the plaintiff – then a Pennsylvania resident[6] – rented a car from Budget in Florida.  Second Am. Compl. at ¶ 44.  When renting the car, the plaintiff signed Budget's standard form rental agreement, which included the standard provisions

---

[4] As I noted in my earlier decision:

> when valuing its cars for its corporate records, Budget records the original cost of the car minus depreciation to arrive at an amount known as "book value." If a car is damaged, Budget will calculate its anticipated "loss" by subtracting the anticipated salvage net proceeds from the sale of the damaged vehicle from the book value of the car prior to the accident.

Humphreys v. Budget Rent A Car Sys. Inc., No. 10-CV-1302, 2014 WL 1608391, at *3 (E.D. Pa. Apr. 22, 2014)

[5] According to Budget's review of its own records, there are also times – approximately 22% in the sample taken from all of the files – where the net book value is higher than the retail fair market value.  Defs.' Mot. in Opp. at 21.

[6] The plaintiff currently resides in Florida.  Hr'g Tr. 39:18-19, Mar. 30, 2016.

that governed damage to a rental vehicle.[7]   The plaintiff chose to decline loss damage waiver ("LDW") coverage[8] because she believed that "both [her] insurance company, but specifically [her] credit card company" covered damage to rental cars.[9] Hr'g Tr. 41:16-24, Mar. 30, 2016.

The plaintiff's rental car sustained damage when it stalled after she drove through sitting water.[10]  See id. at 44:7-45:5.  The car would not restart and ultimately, the plaintiff had it towed back to where she was staying.  Id. at 45:1-46:25.  Later that day, Budget delivered a replacement car to the plaintiff.  Id. at 47: 6-7.  Budget neither notified the plaintiff at the time it delivered the rental car nor when she returned the car at the end of the trip that she would be responsible for the car's damage.  Id. at 47:8-18.

On August 6, 2008, Budget sent the plaintiff a letter.  See Second Am. Compl., Ex. 5 at 12.  That letter stated that "[t]he investigation process of the damages incurred during your rental period indicates that we did not receive sufficient information upon your return."  Id.  Therefore, Budget asked the plaintiff to provide further information regarding the incident.  Id.  The plaintiff, however, neither notified her credit card

---

[7]  These sections are provided verbatim above.  See supra Section I.b.

[8] According to the International Risk Management Institute ("IRMI"), an LDW is "[a]n agreement with an auto rental company in which the renter is released from liability for physical damage to the vehicle in exchange for a fee, subject to the terms of the rental agreement or a state statute if one exists." See Loss Damage Waiver (LDW), IRMI available at https://www.irmi.com/online/insurance-glossary/terms/l/loss-damage-waiver-ldw.aspx (last accessed Feb. 23, 2016).

[9] Although some credit card companies provide coverage for damage to rental vehicles, because such coverage is not an insurance policy, Budget is not allowed to report a claim directly to a credit card company.  Hr'g Tr. 149:11-153, Mar. 30, 2016.  Therefore, Budget depends upon the renter to make contact with his or her credit card company if seeking coverage for the claim.  Id. at 149:11-19.

[10] The plaintiff disputes that she damaged the car, as she claims that the amount of water that she drove through was minimal.  See Hr'g Tr. 46:7-10, Mar. 30, 2016.  While I acknowledge this dispute over the actual cause of the damage to the plaintiff's rental car, this dispute and its resolution are not relevant to the plaintiff's Motion to Certify.

company nor her insurer that she had received this letter or that there was a potential claim for damages as a result of the July 2008 incident.  See Hr'g Tr. 60-:24-61:4, Mar. 30, 2016.

Five months later, in January 2009, Budget sent the plaintiff a letter stating that she owed Budget $11,225.55 for damage to the rental car.  Second Am. Compl. at ¶ 47. Budget calculated the fee as follows:

> $17,434.12 (retail fair market value of the car prior to damage)
> -$6,775 (salvage proceeds minus administrative sale fee)
> $10,659.12 (salvage fee)
> + $416.43 (thirty days Loss of Use fee at 70% utilization)
> +150 (appraisal/evaluation/administrative fees)
> $11,225.55

Id. at ¶¶ 53–57; see also id., Ex. 2 at 9.  Attached to the letter were numerous documents that summarized and detailed the extent of the damages sustained to the plaintiff's rental car.  See generally id at Ex. 2.

The plaintiff contends that this was the first time that Budget provided any notice of a definite claim for damages.  Id.  Because the plaintiff had declined LDW coverage, Budget claimed that she was responsible for any damage to the car while it was in her possession, regardless of fault.  Id.  The plaintiff, however, argues that because Budget first notified her of its claim for damages more than six months after the incident, her

credit card and auto insurance companies declined to cover the claim because the claim was untimely submitted.[11]  Id. at ¶ 49.

On March 2, 2009, the plaintiff sent a letter to Budget stating that her insurer and her credit card company were not willing to pay for the damages.  Id.  She refused to pay the alleged debt "[s]ince the delay of notification by Budget is what precluded timely submission of the claim, it would seem that the fault lies with Budget."  Id.  On April 10, 2009, defendant Viking sent the plaintiff a letter that demanded full payment of the $11,255.55 she allegedly owed to Budget.  Id. at ¶ 52; see also Doc. No. 62 at 40.  The letter, however, did not disclose how Budget calculated the fee.  Id. at ¶ 52.  Rather, it simply listed the total amount of the debt.

### e.  The Plaintiff's Proposed Classes

The plaintiff now seeks to serve as a class representative for others who similarly declined LDW coverage and who Budget charged for damage to a rental car. Ambitiously, she moves to certify four classes and six subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure.  She proposes that the following classes, which I

---

[11] The only evidence that the plaintiff has provided that her credit card company denied her claim is her testimony that she called the company twice and was told that the claim was untimely.  See Hr'g Tr. 54:6-20, Mar. 30, 2016.  There is no evidence on the record, other than this hearsay testimony, that the claim was denied because of when it was filed.  The plaintiff also has failed to provide the defendants or the Court with a copy of her credit card agreement.  See id. at  61:10-16.

Further, GEICO, the plaintiff's automobile insurance carrier, denied the claim on February 10, 2009 because there was "no applicable coverages" on the plaintiff's policy.  See Defs.' Mot. in Opp. at Ex. 7. In other words, GEICO denied the claim because the plaintiff's policy did not cover damage to her rental car.  There is no evidence on the record that GEICO denied the claim because of the time in which it was filed.

will refer to as the "injunctive classes," be certified pursuant to Rule 23(b)(2) of the

Federal Rules of Civil Procedure:

> **The Rule 23(b)(2) Class.** All persons who rented a car
> from Budget; declined Loss Damage Waiver; returned
> damaged cars, which Budget sold for salvage; and who
> have been or will be billed by Budget:
>
> (a) based on the "Loss of Use Formula." The "Loss of Use
>     Formula" is defined as the number of days before the
>     damaged car is sold, not to exceed thirty days,
>     multiplied by 70% of the daily rental rate. ***(the "Loss
>     of Use (b)(2) Subclass")***;[12]
>
> or
>
> (b) based on the "Salvage Formula," where the retail fair
>     market value of the car before such car was damaged
>     exceeded the book value of the car. The "Salvage
>     Formula" is defined as the difference between the car's
>     retail fair market value before it was damaged and the
>     sales proceeds ***(the "Salvage (b)(2) Subclass")***;[13]
>
> or
>
> (c) were sent or will be sent an initial bill from Budget
>     more than 60 days after the alleged incident causing
>     damage ***(the "Late Notice (b)(2) Subclass.")***.

The plaintiff also proposes that the Court certify the following classes, which I will refer

to as the "damages classes," pursuant to Federal Rule 23(b)(3):

> **The Viking FDCPA Class.** All persons who rented a car
> from Budget; declined Loss Damage Waiver; returned
> damaged cars, which Budget sold for salvage; were billed

---

[12] Because the Loss of Use Formula is not charged in California, Illinois, New York, and Wisconsin, the class would exclude individuals who rented in those states.
[13] Because the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

by Budget based on the Loss of Use Formula and/or the Salvage Formula; had addresses in the United States; were sent one or more collection letters from Viking, in an attempt to collect such debt on behalf of Budget; and rented the cars primarily for personal, family or household use after March 26, 2009.[14]

**The Viking and Budget PFCEUA Class** - All persons who rented a car from Budget, declined Loss Damage Waiver, returned damaged cars, which Budget sold for salvage, who was billed by Budget based on the "Loss of Use Formula" and/or the "Salvage Formula", with addresses in Pennsylvania who were sent one or more collection letters from Viking, in an attempt to collect such debt from Budget, that arose primarily for personal, family or household use after March 26, 2008.[15]

**The Budget Breach of Contract/Breach of Good Faith and Fair Dealing Penalty Provision Class** - All persons who rented a car from Budget; declined Loss Damage Waiver; returned damaged cars, which Budget sold for salvage, and:

a)  have been billed by Budget based on the Loss of Use Formula (***the "Loss of Use (b)(3) Subclass"***);[16]

or

b)   have been billed by Budget based on the Salvage Formula where the retail fair market value of the car before such car was damaged exceeded the book value of the car (***the "Salvage (b)(3) Subclass"***);[17]

---

[14]  Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

[15]  Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from this class.

[16] Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from this class.

[17] Because the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

or

   c) received their initial bill from Budget more than 60
      days after the alleged incident causing damage *(the
      "Late Notice (b)(3) Subclass.")*

Doc. No. 95.[18]

### f. Class Discovery

Class discovery closed on July 10, 2015.  See Doc. No. 87.  During that period, a group of Budget's managers worked to identify salvage vehicles from the rental fleet for the time period relevant to the proposed class claims.  Hr'g Tr. 81:2-7, Mar. 30, 2016. Ultimately, Budget exported this data into a spreadsheet.  Id. at 81:6-15.  The original spreadsheet – provided in class discovery – contained information from over 18,000 claim files.  Id. at 81:20-22.  For purposes of class discovery, the parties agreed that the defendants would produce the entire claims file for a sample set of 500 files.  Id. at 81:20-82:3.  After the parties agreed on a methodology for identifying this subset, 481 claims files were produced.  Id. at 82:12-7.

---

[18] The plaintiff has modified these definitions since filing her Second Amended Complaint. Namely, the plaintiff has changed the definition for the salvage b(2) and b(3) subclasses to include only customers who were charged the retail fair market value of the car before it was damaged when that value exceeded the car's book value.  While the defendants do not challenge the plaintiff's ability to do so under the law, they argue that these changes have been made in an attempt "to disguise the fatal defects in her proposed classes by removing any putative class members whose presence reveals the fatal defects in her theories of liability." See Defs.' Br. in Opp. at 17–20.  They further contend that after class discovery, it is now evident that for a significant number of the putative class members, almost a quarter, the book value was actually greater than the retail fair market value.  Id. at 20.  Therefore, these changes are "completely at odds with [the plaintiff's] theory of the case . . . that she will prove, on a class wide basis, that the use of retail fair market value is a violation of the covenant of good faith and fair dealing and/or an unenforceable penalty because book value is 'the proper measure of damages under the law.'" Id. at 20–21.  Furthermore, the defendants argue that allowing the plaintiff to exclude those customers who were benefitted by the use of the retail fair market value would only serve to harm members of the class as well as customers who would have benefited from the current formula in the future.  Id. at 21.

The defendants contend that identifying this sample subset was an arduous task, as they were "required to manually review each and every file to determine in the first instance whether it was, in fact, a salvage formula file or not." Id. at 82:11-24. According to the defendants, this manual review conducted by a team of three lawyers and eight paralegals, took approximately 865 hours over a period of roughly six months.[19] Id. at 82:18-23.  Budget contends that there is no automated way to identify which customers were actually charged the salvage formula.  Id. at 84:9-17.  Further, because book value is not maintained in Budget's claims management system and not a value that is considered as part of the salvage process, it was not necessarily readily available for each of the claim files.[20] Id. at 85:2-4.  Defense counsel speculates that it could take almost 36,000 hours to complete the review necessary to properly identify all members of the proposed classes and subclasses.

Furthermore, the defendants had to engage in a manual review to determine who actually paid the claim, as Budget's system only records whether a recovery was made. Id. at 101:23-25;102:1-3.  Neither Budget's systems nor the spreadsheets indicate whether payment was made by the renter, an insurer, a third party, or a credit card company.  Id. at 102:1-2.  Thus, a manual review of each file was necessary to look for

---

[19] This calculation does not include the time spent by Budget's own employees. Hr'g Tr. 83:23-84:2, Mar. 30, 2016.  The plaintiff, however, argues that this manual review is unnecessary.  Instead, she argues that only two to three documents had to be reviewed from each file.  Hr'g Tr. at 16:11-16, May 12, 2016. Defense counsel concedes that if he only had to review two pages from each file, this review would have taken less time. Hr'g Tr. 111:11-112:1, Mar. 30, 2016.

[20] After its review of 481 files, Budget contends that the book value was only available in 384 files.  Hr'g Tr. 85:8-11, Mar. 30, 2016. Conversely, the retail fair market value was contained in all but three of the 481 claim files that were part of the sample set, as Budget lists a car's retail fair market value on the Vehicle Loss Disclosure form, a form that also lists the dollar amount that was charged to the renter.  Id. at 94:3-5; 94:14-21.

correspondence and other documentation that would indicate who made the payment.[21]

Id. at 102:3-73.  Further, the defendants' review of the sample files revealed that there

was no "record in any file of an insurance company or credit card company denying a

claim to Budget on the basis of the timeliness of the notice."  Id. at 104:2-5.  Rather, the

only file that contained such information was the plaintiff's, in which they found the

letter that she sent to Budget indicating that because the claim was submitted to her in an

untimely matter her credit card company was declining coverage.  Id. at 104:5-10.  The

reviewed claims files also did not contain the renters' credit card or insurance agreements

that governed the renters' ability to submit such claims.  Id. at 104:16-24.

The plaintiff filed her Motion to Certify on August 7, 2015.  The matter was fully

briefed by November 2015.  After resolving the parties' various disputes regarding the

scope and timing of an evidentiary hearing on the motion, I held an evidentiary hearing

on March 30, 2016.  On May 12, 2016, the parties presented argument to the Court on the

motion.  The matter is now ripe for adjudication.

## II.    STANDARD OF REVIEW

"Class certification is proper only if the trial court is satisfied, after a rigorous

analysis, that the prerequisites of Rule 23 are met."  In re: Hydrogen Peroxide Antitrust

Litig., 552 F.3d 305, 309 (3d Cir. 2008) (footnote and quotation marks omitted); see also

Reyes v. Netdeposit, LLC, 802 F.3d 469, 484 (3d Cir. 2015).  "[T]he party proposing

---

[21] The defendants argue that should no such evidence be available in the file, they would have to engage in "some investigation beyond the claim files in order to determine whether there was a payment made by an insurance company on behalf of that renter."  Hr'g Tr. 103:19-22, Mar. 30, 2016.

class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015).

The United States Court of Appeals for the Third Circuit recently clarified the legal standards applicable for class certification and explained the meaning of the "rigorous analysis" called for by Rule 23. See Reyes, 802 F.3d at 483; see also In re: Hydrogen Peroxide, 552 F.3d at 316; Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982) (holding class certification is proper only if the district court concludes, after a rigorous analysis, that the prerequisites of Rule 23 are met). In Reyes, the court noted that when evaluating a motion for class certification, a district court must:

> (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits) in order to (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements.

Id. at 485. Furthermore, the trial court's proper task "in deciding whether to certify a class [is to] resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all the relevant evidence and arguments presented by the parties." In re: Hydrogen Peroxide, 552 F.3d at 320. Therefore, at the certification stage, a district court must resolve such factual or legal disputes that are "'relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action.'" Reyes, 802 F.3d at 484 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 591 (3d Cir.

2012)); see also Powers v. Lycoming Engines, 328 F. App'x 121, 123 (3d. Cir. 2009) ("The mandates set out in Rule 23 are not mere pleading rules . . . . Unless each requirement is actually met, a class cannot be certified.")(internal citation and quotation marks omitted).

## III.   DISCUSSION

This Court may certify a class action only if the plaintiff satisfies all four provisions of Rule 23(a) and at least one provision of Rule 23(b).  See, e.g., Amchem Prods. v. Windsor, 521 U.S. 591, 613–14 (1997).

### a.   Rule 23(a)'s Requirements

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> > (2) there are questions of law or fact common to the class;
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> > (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  The Rule 23(a) requirements have been termed: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.

### i.   Numerosity

A plaintiff must demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Generally if the named plaintiff

demonstrates that the potential number of plaintiffs exceeds 40" the numerosity requirement has been satisfied. Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). While, there is no minimum number of plaintiffs required to maintain a suit as a class action, id. at 226, "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." Brown v. Phila. Hous. Auth., No. 06-CV-1495, 2006 WL 1737212, at *2 (E.D. Pa. June 22, 2006)(internal quotation marks and citation omitted).

The plaintiff contends that the Rule 23(b)(2) class contains at least 400 members, and that each of the injunctive subclasses contains at least forty members. Pl.'s Mot. to Certify at 16. She also contends that the damages class contains over 440 members. Id. The smallest subclass she proposes is the PFCEUA class, which she argues has ninety-three members.[22] Hr'g Tr. 20:21-21:7, May 12, 2016.

In their papers, the defendants do not provide argument as to why the plaintiff has failed to meet Rule 23(a)'s numerosity requirement. Instead, in a mere footnote, they argue that they "do not agree with plaintiff's calculation of the number of putative class members in her various proposed classes and subclasses." See Defs.' Br. in Opp. at 23 n.9. Because they contend that the plaintiff cannot meet the other requirements of Rule 23(a), the defendants declined to provide alternative calculations for the number of putative class members. At oral argument, however, the defendants argued that the

---

[22] In her Motion to Certify, the plaintiff stated that there were "at least 15 members" in the Viking and Budget PFCEUA class. Pl.'s Mot. to Certify at 16. Because I believe that the plaintiff has sufficiently met her burden of demonstrating that numerosity has been satisfied, I need not determine which assertion is correct.

plaintiff failed to meet her burden of demonstrating numerosity because it would require the court to speculate about what happened to other prospective class members.  Hr'g Tr. 51:19-24, May 12, 2016.

I am satisfied that despite the defendants' arguments, the plaintiff has met her burden of establishing that the proposed nation-wide classes and subclasses[23] are sufficiently numerous.  Her contentions regarding class size are more than speculative. Rather, at the hearing, by manipulating a spreadsheet that contained information from 481 sample salvage files, she demonstrated that each class and subclass contains enough members that joinder would be impracticable.  Therefore, the plaintiff has established numerosity.

### ii. Commonality

Commonality is a consideration of whether there are "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2).  As the Supreme Court has noted, the commonality language of Rule 23 is "easy to misread, since [a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011) (internal quotation marks omitted)(alteration in original).  Rather, the commonality requirement is satisfied "when there are classwide answers." Reyes, 802 F.3d at 482 (citing Dukes, 564 U.S. at 350).

---

[23] The fact that customers from certain states are excluded from the loss of use and salvage formula subclasses, as discussed above, does not alter my decision that the classes and subclasses as proposed satisfy the numerosity requirement.

Thus, the class claims must depend upon a common contention that "must be of such a nature that it is capable of classwide resolution." Dukes, 564 U.S. at 350. Commonality, however, "does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.'" Reyes, 802 F.3d at 482 (quoting Dukes, 564 U.S. at 359); see also id. (noting that the inquiry must focus on "whether the defendant's conduct is common to all of the class members . . . the bar is not a high one.")(internal quotation marks and citations omitted); In re: Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 397 (3d Cir. 2015) cert. denied sub nom. PNC Bank v. Brian W., No. 15-CV-693, 2016 WL 763688 (U.S. Feb. 29, 2016) ("The bar is not high; we have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, . . . when class members did not have identical claims, . . . and, most dramatically, when some members' claims were arguably not even viable, . . . ."). Therefore, the focus "is not on the strength of each class member's claims but instead 'on whether the defendant's conduct was common as to all of the class members.'" In re Cmty Bank, 795 F.3d at 397 (quoting Sullivan v. DB Investments, Inc., 667 F.3d 273, 298 (3d Cir. 2011)).

Here, the plaintiff contends that:

> [t]he legitimacy and legality of this contract and these formulas and the legitimacy and the legality of the standardized collection letters and demand packages that Budget and its agent, Viking, sent to these customers present common and predominant issues that can be resolved for all class members following a single, manageable trial.

Hr'g Tr. 3:7-12, May 12, 2016.  Further, the plaintiff argues that because a standardized contract was used by all members of the proposed class and because standardized dunning letters were sent in an attempt to collect payments Budget claims were owed, she has met her burden of establishing that common questions exist.

Contrary to the plaintiff's arguments, however, this is not a run-of-the-mill contract dispute.  The central question here is not whether the defendants' use of the retail fair market value in lieu of the car's book value violates the contract itself.  Nor is the issue whether the defendants' alleged practice of billing customers over 60 days after the alleged incident that caused damages violates the contract's terms.  In fact, to the contrary, the parties agree that Budget has applied the salvage formula to members of the proposed class in exactly the way in which the contract allows.[24]  Additionally, the contract is silent regarding when a claim for damages must be submitted to a customer. Therefore, the central question in this suit is not whether or not Budget breached the contract.  Rather, the question is whether or not these formulas are invalid liquidated damages clauses and whether Budget's billing practices violates the covenant of good faith and fair dealing.  The answers to these questions will not be found by looking at the contract's language and comparing it to the defendants' actions (or inactions).  Rather, the answers will only be found through an analysis of whether or not these formulas and

---

[24] The plaintiff does note, however, that the loss of use formula is not disclosed within the contract. Rather, the contract states that the renter will "also pay for loss of use of the car, without regard to fleet utilization, plus an administrative fee, plus towing and storage charges, if any."  Second Am. Compl.,  Ex. 1 at 2.  Nonetheless, the plaintiff argues that Budget's formula is an impermissible liquidated damages clause, which, as I discuss above, is inherently not a breach of contract claim.

the defendants' billing practices violate state laws governing liquidated damages provisions and pertaining to the covenant of good faith and fair dealing.

### 1. Choice of law issues

Because the plaintiff seeks to represent nationwide classes and subclasses to advance claims that raise state law issues, I must, as a threshold matter, determine whether the variations in state law will "swamp any common issues."[25] See Grandalski v. Quest Diagnostics, Inc., 767 F.3d 175, 180 (3d Cir. 2014) (quoting Sullivan v. DB Invs., Inc., 667 F.3d 273, 304 n.28 (3d Cir. 2011))(internal quotation mark omitted); see also Powers, 328 F. App'x at 124 ("A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply."). The burden is on the plaintiff to "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" Powers, 328 F. App'x at 124. "This comprehensive analysis is necessary because aggregate class action should not alter the applicable substantive legal rights of the plaintiffs." Id. (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821 (1985)).  Moreover, this inquiry is key when determining whether there are classwide answers to the common questions the plaintiff argues that she has posed in her class complaint.

---

[25] This inquiry, however, is not solely applicable to whether or not commonality has been met.  Rather, determining which law or laws govern the action also plays a role analyzing the "typicality, and adequacy requirements of Rule 23(a), and the superiority and predominance factors of Rule 23(b)(3)." Powers v. Lycoming Engines, 328 F. App'x 121, 124 (3d Cir. 2009).  Further, it is clear that I must engage in this inquiry at this stage of the litigation.  See Grandalski v. Quest Diagnostics, Inc., 767 F.3d 175, 180 (3d Cir. 2014) (noting that the Third Circuit has found error when a district court failed to engage in a choice–of-law analysis at the certification stage).

The Third Circuit has noted that variations in state law may preclude class
certification.  Sullivan, 667 F.3d at 304 n.28; see also Grandalski. 767 F.3d at 184
(affirming the district court's decision that variations in state law precluded certification).
For purposes of certifying a litigation class, the court noted that "if more than a few of the
laws of the fifty states differ, the district judge would face an impossible task of
instructing a jury on the relevant law."  Id. (citing Klay v. Humana, Inc., 382 F.3d 1241,
1261(11th Cir. 2004 ))(internal quotation marks omitted). The court also acknowledged
the inherent difficulties a district court would face when trying such a claim on a class
basis.  Id.

Pennsylvania's choice-of-law principles apply to this case, as a federal court
sitting in diversity must apply the choice-of-law rules of the state in which it sits to
determine the applicable state law.  Chin v. Chrysler, LLC, 538 F.3d 272, 278 (3d Cir.
2008) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)); see also
In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig., No. 12-CV-
07263, 2015 WL 2417411, at *2 (E.D. Pa. May 20, 2015).  Pennsylvania employs a
"flexible rule" which combines the "significant contacts" analysis of Restatement
(Second) of Conflict of Laws § 145 and a "governmental interest analysis." See Griffith
v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964) ("[W]e are of the opinion that the
strict lex loci delicti rule should be abandoned in Pennsylvania in favor of a more flexible
rule which permits analysis of the policies and interests underlying the particular issue
before the court."). "The merit of such a rule is that 'it gives to the place having the most
interest in the problem paramount control over the legal issues arising out of a particular

factual context' and thereby allows the forum to apply 'the policy of the jurisdiction most intimately concerned with the outcome of [the] particular litigation.'" Id. at 806 (citation and quotation marks omitted).

Thus, Pennsylvania's choice-of-law analysis asks three questions: (1) is there an actual conflict or a false conflict between potentially applicable states' laws, (2) if there is an actual conflict, is there a "true conflict" based on the governmental interests underlying each law, and (3) if there is a "true conflict," which state has more significant contacts and a greater interest in its law being applied. See Specialty Surfaces Intern., Inc. v. Cont'l Cas. Co., 609 F.3d 223, 229–36 (3d Cir. 2010); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229–36 (3d Cir. 2007). While the plaintiff argues that the "defendants unduly complicate the choice of law analysis," I disagree. See Pl.'s Rep. Br. at 17. Rather, it is clear to me that the choice-of-law analysis – a crucial inquiry – prevents the proposed classes and subclasses from being certified.

To determine which state's law will govern the plaintiff's claims, I will have to engage in Pennsylvania's choice-of-law analysis not once but numerous times. The first step of the inquiry – determining whether an actual conflict exists – will require me to engage in an individualized inquiry for each class member, as I will need to analyze the laws of both the rental state and the individual class members' home state, to determine if "there are relevant differences between the laws." Hammersmith, 480 F.3d at 23. If an actual conflict exists, then I will need to classify the conflict as "true," "false," or "unprovided-for." McDonald v. Whitewater Challengers, Inc., 116 A.3d 99, 107 (Pa. Super. Ct. 2015), appeal denied, 130 A.3d 1291 (Pa. 2015). A "true conflict" exists if

"the governmental interests of both jurisdictions would be impaired if their law were not applied," Garcia v. Plaza Oldsmobile, Ltd., 421 F.3d 216, 220 (3d Cir. 2005), while a "false conflict" exists when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991). When a false conflict exists, "the court must apply the law of the state whose interest would be harmed if its law were not applied." Id. If a true conflict exists, then I must proceed to the second step of the choice-of-law analysis. Cipolla v. Shaposka, 267 A.2d 854, 586 (Pa. 1970); see also McDonald, 116 A.3d at 107.

In an attempt to meet her burden of demonstrating that this analysis should not bar class certification, the plaintiff offers three spreadsheets that summarize the elements of her state law claims under each state's laws. See Savett Decl., Exs. 19-21. She then argues that the choice-of-law analysis is "simple" because "either the laws are uniform and Pennsylvania law can apply to everyone, or the law of the Class member's rental state will apply." Pl.'s Mot. for Class Cert. at 17–18.

The plaintiff has overly simplified the burden that she faces. Instead of engaging in an extensive analysis of the state laws invoked by her class complaint, she has placed before the court charts that attempt to lay out the state law "standards" for determining whether liquidated damages clauses are permissible and whether a party has breached the covenant of good faith and fair dealing. These charts alone are not sufficient to end the inquiry that I would have to engage in prior to certifying the class. Rather, I would have to look at each of these "standards" in the context of the individual state's case law to determine how they have been applied to decide whether or not a conflict even exists.

Thus, the plaintiff has merely shifted the burden to the Court to determine whether state law prevents class certification and decline the plaintiff's invitation to engage in this analysis.  Therefore, because the plaintiff has not met her burden of credibly demonstrating, <u>through an extensive analysis</u>, that the variations in state laws do not present "insuperable obstacle[s]" to finding common answers to the questions posed, I will deny her motion to certify.[26]  <u>Powers</u>, 328 F. App'x at 124.

### i. Adequacy

Even if the plaintiff could establish that choice-of-law issues do not preclude certification, I still could not certify her late notice subclasses, because <u>she is not a member of those subclasses</u>.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4). "This inquiry concerns both (1) the experience and performance of class counsel; and (2) the interests and incentives of the representative plaintiffs."  <u>In re: Processed Egg Products Antitrust Litig.</u>, No. 08-MD-2002, 2015 WL 7067790, at *4 (E.D. Pa. Nov. 12, 2015) (quoting <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 181 (3d Cir. 2012)) (internal quotation marks omitted); <u>see also</u> <u>Martin v. Ford Motor Co.</u>, 292 F.R.D. 252,

---

[26] I also must deny the plaintiff's motion with regards to her proposed FDCPA and PFCEUA classes. Even though these claims are based upon the plaintiff's contention that the defendants' actions violated a specific and common statute, they still raise state law issues.  The plaintiff argues that the letters sent to the class members were "uniformly misleading and confusing" because they did not disclose that the damages were calculated using the retail fair market value for the car in lieu of the car's book value.  Pl.'s Mot. to Certify at 10.  Thus, her FDCPA and PFCEUA claims are based upon the contention that the salvage and loss of use formulas were impermissible liquidated damages clauses.  For the same reasons noted above that prevent me from certifying these subclasses, I also must deny the plaintiff's request to certify the FDCPA and PFCEUA classes, as the choice-of-law issues are also present with regards to these claims and prevent common answers, as required by Rule 23(a).

269 (E.D. Pa. 2013) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). Furthermore, the Supreme Court has been clear: "a class representative must be part of the class and possess the same interests and suffer the same injury as the class members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 –26 (1997)(citing East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted).

Here, the plaintiff has not provided this court with any competent evidence that she is in fact a member of the late notice subclasses.  Rather, the only evidence that her credit card company denied her claim is her testimony that she called the company twice and was told that the claim was untimely.  See Hr'g Tr. 54:6-20, Mar. 30, 2016.  There is no evidence on the record, other than this hearsay testimony, that the claim was denied because of when it was filed.  Further, the plaintiff has neither provided the defendants nor the Court with a copy of her credit card agreement.  See id. at 61:10-16.  Without this evidence the plaintiff cannot demonstrate that she is a member of the late notice subclasses.  Therefore, even if she could prove that the choice of law issues did not preclude certification, I would deny her motion with regards to the late notice subclasses.

## IV.    CONCLUSION

For the foregoing reasons, I will deny the plaintiff's motion for class certification, as it is clear to me that she has not met her burden of demonstrating that common answers exist to the questions she poses.  Further, even if she could demonstrate through an extensive analysis that the choice-of-law issues do not preclude class certification, I

would deny the plaintiff's motion with regards to the late-notice subclasses, because she has not demonstrated that she is in fact a member of those two subclasses.  The plaintiff has had years to meet her burden – this case was filed in 2010, and the motion for class certification was filed in August of 2015.  Despite having years to craft her arguments and to demonstrate to the Court that certification is appropriate, she has been unable to do so.  Therefore, I will deny her motion with prejudice.

    An appropriate Order follows.